Please be seated. Good morning. The first case is an oral argument on case numbers 20-6018 and 20-6019, Henry, Jerry, and Robert Marsh. Madison Resource Funding Corp. v. Jerry and Robert Marsh. Mr. Fling. Good morning, sir. Good morning, Your Honor. May it please the Court. Counsel, my name is Matthew Fling. I represent the appellants Robert and Jerry Marsh. This is a joint appeal from final judgments in two adversary proceedings in which judgments of nondischargeability on the basis of fraud were entered against appellants in the amount of $1,676,162.20. The factual backdrop for this decision is as follows. The essential parties are Robert Marsh, Jerry Marsh, Madison Resource Funding, Cineco, which is a company that was formed in 2006 as a temporary staffing agency which operated to fulfill the temporary staffing needs of other companies. Robert Marsh was employed as president. Jerry Marsh was also involved.  Cyglo was formed in 2013 by Jerry Marsh. Cyglo was also a temporary staffing agency. And Jerry Marsh was the sole owner and employee of Cyglo. Now, Madison provides payroll and billing services to temporary staffing agencies. It buys existing and future accounts of those companies. And by providing payroll services and funding to staffing agencies, Madison enables the temporary employees of those staffing agencies to be paid essentially on time. Mr. Fling? Yes. We're generally familiar with all that background. Can we kind of dive into what the bankruptcy court did that you're appealing? Yes. Essentially, we are appealing the trial court's determination of damages. Do you concede that the first four elements of fraud have been met and only the fifth element, damages, is the issue? Yes, Your Honor. We do concede that. And can we drill down just a little bit more? Are you disputing that there were damages, or are you disputing the amount of the damages? We're not disputing that there were damages. There's a distinction here, we believe, first of all, between contract damages and fraud damages. And I think that's the essence of the argument. Okay. So, again, just to be clear, you concede that damages did exist? Correct. Okay. Now we've got to get into an issue that I've had all along on this, and that is, did the bankruptcy court enter a judgment for money damages? No. The bankruptcy court issued a judgment for non-dischargeability but determined the amount of the debt that was non-dischargeable. Without interest? Without interest, that's correct. So our issue is essentially this. The determination of the amount of damages is made under state law. In Minnesota, the law on fraud is not benefit of the bargain damages, which is a contractual measure of damages, but it's out of pocket. Our contention is that Madison failed to prove the amount of its damages attributable to the fraud because it did not provide evidence as to the amount of its out-of-pocket loss. It simply said, here are our contractual damages. That's what was testified to. That's what Exhibit 33 referred to. It's a calculation based on – it's everything. It's what did we put out there, what are we owed, what's our profit, everything. And that's the lump sum figure. But the bankruptcy code, under 523A Actually, isn't it the amount they advanced that they didn't get repaid? No, it's the amount that they advanced plus. If you take a look at the contract, there's a service fee. There's a 4 percent service fee. Somehow in there, and we don't know, and that's the whole problem. Somewhere in there is profit. They're not just floating $1.6 million and then getting paid $1.6 million. That's not the way the numbers work out. If that were the case, why are they in business? They wouldn't have any profit. They wouldn't be making any money. So the way the process essentially works is that they advance the funds, as I understand it, they advance the funds for these temporary employees to get paid. And then they invoice for the amount, and it's essentially a gross invoice in the sense that they are billing for the amount that they advanced plus everything else. And the only thing we got here as evidence was that gross amount. So if the damages are determined, if the amount of the damages are determined by out-of-pocket, we don't know what that out-of-pocket is. And it's not up to us to sort it out. It's up to Madison to prove it. Let me ask you a question about that then. The out-of-pocket rule only applies to tort claims. Is that correct? No, I believe it applies to fraud claims under Minnesota law. Okay, but if I have a contract claim against someone under Minnesota law, I'm not limited to my out-of-pocket damages when I sue for breach of contract, correct? That's correct. Okay, so didn't the bankruptcy court find that Jerry Marsh's claim was sounded in contract? Yes, Jerry Marsh's claim was sounded in contract. Okay, so how then does the out-of-pocket rule apply to that claim? Excuse me, because if it were only a contract claim, if that were the only basis for the claim, it wouldn't be non-dischargeable. Well, that's not true though, is it? Because we have a two-step process. First of all, we have to establish a claim under State law, which I believe the bankruptcy court said with Jerry Marsh was a breach of contract and with Robert Marsh it was a conspiracy claim. So that's the claim under State law. And under State law, if I'm understanding the out-of-pocket rule, it would not apply to those claims because they don't sound in tort. Then our second step is to find out whether or not those claims, the breach of contract claim and the conspiracy claim, are non-dischargeable under bankruptcy law. So the Minnesota out-of-pocket rule has no bearing on the determination under 523, does it? Well, the bankruptcy codes specifically states, and I just want to get the correct language in front of me here, that a discharge does not discharge an individual debtor from any debt obtained by false pretenses of false representations or actual fraud. Correct. So this was a breach of contract claim obtained by, in the bankruptcy court's opinion, and you're not challenging the findings regarding non-dischargeability, there was a breach of contract claim that was obtained by fraud. So the breach of contract claim isn't subject to the out-of-pocket rule. And the Minnesota State law can't limit Federal bankruptcy law, can it? No, it can't, Your Honor. It's my argument that we're talking about the portion of the claim that was obtained by fraud. So there's no question but that there's a contract claim. Okay. But we're looking at what did, you know, the damage, the proper damages on a fraud claim under State law is what was obtained, what was received by the party who allegedly committed the fraud. It isn't what the party that was harmed did not receive. I mean, there's a difference. No, I understand the out-of-pocket rule, and you did a nice job of briefing the out-of-pocket rule, and I was not familiar with it, so now I understand it better thanks to your explanation. My concern is I think we're conflating the first step of determining a claim under State law and the second step of determining whether or not that claim was obtained by fraud within the meaning of Section 523. It is a two-step process, and I think we're conflating those two steps is my concern. I think the BAP twice has said it's a two-step process. First, determine the validity of the debt under applicable law, which would be State law. Second, determine whether that debt should be accepted from discharge under Federal law, meaning the code, 523A2A. And I think that's what Judge Nail is saying. At least that's what he wrote, and that's what Judge Saladino wrote. We're interpreting the obtained by language to mean the portion of the claim, not just the ‑‑ it would always be the case, then, if you have a ‑‑ it seems to me that if you have a contract claim, then it's always the case that the entire amount of the claim would be obtained by fraud, even though when you define fraud, when you define what was obtained through false pretenses, it is not the entire amount of the claim. It's only a portion of it. So our argument, and perhaps I'm just overstating it, is essentially that State law would require a proof of what was obtained by fraud, what the debtor received, not what the creditor didn't receive. But didn't Madison lend on the basis that Jerry's company was Bob's company? Yes. And I think we also need to distinguish, because you're bringing up Jerry versus Robert, and I think ‑‑ I think we need to make a distinction here between Jerry Marsh and Robert Marsh. And as Your Honor indicated, the Court made a determination that Robert Marsh was liable on the basis of conspiracy. Okay. There was no contract with Robert Marsh, none whatsoever. So at least in Robert Marsh, especially in Robert Marsh's case, the determination is not under ‑‑ it wouldn't be made under contract law. It would be made under, you know, a determination of what he actually obtained. But didn't they both admit it? I mean, in all their requests for admissions that were never answered, so aren't all the elements, including damages and the amount of damages, other than perhaps $0.20, admitted? Except for $0.20? I'm going to ask Mr. Rattel about the missing $0.20. They admitted it except for request number 61, which refers specifically to the dischargeability of the debt. But you're not disputing the dischargeability determination? Except for damages. Except for damages. The amount of the damages. That's correct. To be specific. That's correct. We're into your rebuttal time, if you know. Well into it. If there are no more questions at the moment, I will reserve the remaining time for rebuttal. Thank you. Thank you, Mr. Flynn. Mr. Rattel, good morning. Good morning, Your Honors. It pleases the Court, Paul Rattel, appearing on behalf of Madison Resource Funding Corporation. First of all, I would say that with regard to the order that was issued by Judge Fisher, it was comprehensive, detailed, and very carefully parsed and reasoned. All of the issues giving credit for all the arguments that were raised before him and addressing them not only factually but legally. And he went through what, from my perspective, looks like a painstaking and very careful review of this matter because it's a serious type of claim to bring against these two individuals who have been in business for many, many years, but to end up with a determination of non-dischargeability of a claim of this size is very serious. And the Court took great pains to go through all of those issues. With respect to the Court's comments regarding the conflation of debt and the issue of out-of-pocket loss, I agree with that. I think that the Court took pains to make that distinction in his order. The Court said, in the first instance, there has to be a debt. If there's no debt, then there's no claim. And then secondly, the issue is whether or not the debt is non-dischargeable for the reasons laid out in 523A28. And the Court made that very, very clear. But in dealing with all of the arguments that were raised in this case, including the argument based on Lewis v. Citizens' agency of Medela, the Court wanted to address that very specifically and went through what I thought was a very clear explanation of why, number one, that out-of-pocket loss rule doesn't apply, but even if it did, it wouldn't change anything. And one of the reasons that it wouldn't change anything is that consequential damages are also permissible, can be recovered under the out-of-pocket loss rule. And the Court identified several cases to that effect and found that to the extent, if any, there is so-called profit within the $1,676,000 number, that those would be consequential damages that would be permissible under a pure tort claim in any event. And so, and Lewis v. Citizens' agency case by the Minnesota Supreme Court made it very clear that they felt that in the proper case that there should be a modification to the out-of-pocket loss rule. In fact, the Court didn't really apply strictly the out-of-pocket loss rule in that case because they felt that it would result in a, well, an unjust result for the widow who paid. Kennedy, if we have to go down that avenue, I'm not sure that it's necessary to go down that route. I agree, Your Honor. I agree. I agree. You know, one of the issues that occurs to me is that, well, again, the Court was being careful and was being respectful of all the arguments that were raised. And so I think he felt compelled to address that. But I think he made another point in his analysis, and that was to, quote, 523A2A, which says a discharge does not discharge an individual debtor from any debt, any debt. And that's the critical word. And he made the observation that, look, debt is not limited to fraud and includes claims such as breach of contract. Once a debt of any kind is established, 523A2A requires proof that this debt was obtained by fraud. Counsel has acknowledged that there was fraud associated with the incurrence of this debt. We have abundant evidence, affirmative evidence, presented at court from Mr. Chipman, who laid out the amount of that claim and the basis of that claim in Exhibit 33 and the schedule that's attached to Exhibit 33, which includes the $0.20, Your Honor. And we also have the request for admission, particularly number 37, where each of the parties acknowledges and admits this dollar amount, save the $0.20. And the Court relied on those admissions to establish that claim. So we've got the affirmative statements by Richard Chipman, the documents that were entered into evidence. And I would submit that they were entered into evidence without objection on page 44 of the transcript, ECF-150, where Exhibit 33, among others, were offered into evidence. The Court said these exhibits are all admitted if you agree that is. And Mr. Fling said no objection, Your Honor. So there was no objection to this, to Exhibit 33. It laid out exactly what the unpaid claim amount was that was associated with the U.S.-BARTAC relationship. In addition to that — Why did it take Madison so long to figure this out? They didn't. Well, what happened, Your Honor, is that they received a wire transfer in May of 2016, and that was the first evidence that they had that the money wasn't coming from U.S. Bank. Up to that point, they were receiving ACH transfers that — But don't you know who the sender is? No, not an ACH transfer. And there was evidence to that effect at trial, Your Honor, that, no, they — they received all of these transactions, all of these payments from all their various clients, and they — when you get into factoring like this and you're dealing with literally hundreds of transactions on a daily basis and you're processing them, what they had to do is then they went back to Jerry Marsh once the money came in and said, all right, what invoices does this apply to? And he would tell them and send them copies of the invoices that he purportedly sent to U.S. Bank, which was false. He didn't send any of these to U.S. Bank, et cetera, et cetera. So, no, it was when they got the wire transfer and they realized, why is this money coming from Cyglo? Why isn't it coming from U.S. Bank? And that's what raised the red flag and everything fell apart at that point. In the issue of justifiable reliance, which the Court spent some time addressing in the order — I think — I thought Mr. Fling suggested that all of the elements other than the Yes. Yes. I just wanted to address the Court's concern with regard to that particular issue. So, yes, exactly. I would call it more curiosity than concern. I just wondered. It got to be a large number. It couldn't have been a smaller number. Exactly. No, it was a significant outlay. And the last point I guess I'd make with regard to the damages, Your Honor, is that the testimony from Mr. Chipman, who helped prepare the schedule upon which the amount of the advances made by Madison on account of the temporary employees that were placed by Cyglo with U.S. Bank or through Cyglo with U.S. Bank, that was the amount of money advanced. So we really don't even get into the issue of what is profit and what is not profit with regard to that number. He said several times during his testimony, these are our advances, money that we advanced and ended up in the pockets of the individual employees. I asked Mr. Fling about the judgment. I'm going to ask you about it, too. So you've got this judgment that says the debt in the amount of 1.6, whatever, is non-dischargeable. What can you do with that judgment? Can you execute on that judgment? Your Honor, the next step that we would take is we would go into state court and ask the court to enter judgment in the amount of the non-dischargeable claim. Is there a state court? There is a state court lawsuit that was stayed during this. Right. I think that provoked all the... Exactly right, Your Honor. That's right. Then you would have a judgment you could execute on. Exactly. That's right. The order for judgment seemed to not rely upon an amount, but the judgment did. Yes. Yes. That's right. With regard to, for example, prejudgment interest, the court wanted to try to get that resolved at some point during the case, and we couldn't come to an agreement. So the court just said, look, you'll have to go into state court and figure out what that is. So that would be the next step. I have a little bit of time, but if the court has any questions, I think... You're never obligated to use all your time. Thank you, Your Honors. Thank you. Thank you. In rebuttal, I simply want to emphasize again that there is a distinction in the case between Jerry Marsh and Robert Marsh and the type of claim that was brought and the factual determinations that were made. I point out that the only basis for the court's determination against Robert Marsh was the failure to answer the request for admissions. That's the entire case. There were no other findings. Why isn't that sufficient? Well, again, we believe that because the ultimate legal conclusion was the result that that was admitted, that you really need to look to all the rest of them and I think that all the rest of the admissions, and we would argue that those are insufficient to establish the non-dischargeability in and of themselves. Okay. I need you to clarify for me how it's possible to concede the elements have been satisfied, which I understood you to say earlier, and how that doesn't lead to the inescapable conclusion of non-dischargeability. I understand that the ultimate determination of non-dischargeability is a legal conclusion, but if you conceded admitted to by the request for admissions being deemed admitted and conceded this morning, if you've conceded the elements, how does it not lead the bankruptcy court and lead us in reviewing the bankruptcy court to reach the legal conclusion of non-dischargeability? Well, again, that specific admission refers to the amount of the debt being non-dischargeable. Wasn't there an earlier admission somewhere in the late 20s, early 30s of the admissions where the amount of the damages were admitted? Am I misremembering? No. It says Robert Marsh admitted he owes a debt to Madison related to the funds advanced, U.S. Bank, 1.6 million. That's the admission. Yes, but not with respect to fraud. Again, it's only with the fraud that it's non-dischargeable. Thank you. Thank you. Thank you. Next case, please.